NO. 8320

COURT OF APPEAL

PARISH OF ORLEANS

—————

EUNICE ICE & POWER COMPANY

In Liquidation

versus

A. MARX & SONS.

———————

—————————

*Court of Appeal,*
*Parish of Orleans*

FILED 6/16/22

L. P. Stansbury

672

Dinkelspiel; J.

This suit brought by plaintiff, averring that defendants bought certain lot of mixed scrap at various times at an agreed price of $17.50 per ton, the copper scrap at sixteen cents per pound and the brass scrap at thirteen cents per pound; there were shipped to defendants three cars of mixed scrap and four barrels of mixed brass and copper scrap. The allegations of the petition go on to assert that defendants paid for two of the cars of mixed scrap but never paid for the balance, hence they prayed for judgment in the full sum of $444.76.

The answer and reconventional demand of the defendants admit that they bought a certain lot of mixed scrap from plaintiff, but deny that the amount in question claimed by plaintiff was owing by them, but assert the fact to be that on or before February 18th, 1920, they purchased from plaintiff a certain lot of mixed scrap material which was located at Eunice, Louisiana, for the price and sum of $17.50 per ton; that under said contract plaintiff shipped them some of the scrap material, for which they paid, and alleging further that plaintiff contrary to their obligations under the said contract and in violation of its duty thereunder, separated from the said lot of scrap material, the scrap cast, which was the most valuable part of the lot, and sold same for $33.00 per ton, refusing to make any further shipments from the said lot to them. That defendants were entitled to an accounting showing the proceeds of sale of the scrap cast made by plaintiff, and all other material comprised in the said lot of mixed scrap or otherwise disposed of by plaintiff in violation and breach of their contract with defendant, and therefore defendant is entitled to recover from plaintiff the difference between the proceeds of such sales and the contract price of $17.50 per ton. Finally they pray that plaintiff's suit be dismissed at their costs and that plaintiff be ordered to account herein to defendants for

673

the proceeds of the sale of said scrap cast and all other material comprised in the said lot of mixed scrap wrongfully converted and sold or otherwise disposed of by plaintiff, and defendants deducting the amount alleged to be due plaintiff, which they state to be $343.79, in reconvention pray for a judgment for balance due them by plaintiff of $943.21.

An examination of this record goes to show that in the early part of February, 1920, the plant of the Eunice Ice and Power Company burned and their affairs were taken over by three liquidators, who are the plaintiffs and appellees herein. The fire evidently destroyed the property and it became necessary to dispose of most of it as scrap, and in this connection letters passed between plaintiffs and defendant, which substantially led to this controversy; and after several preparatory letters between plaintiff's liquidators and defendants, finally terminated in letter addressed to plaintiff dated February 18th, 1920, wherein the defendant wrote:

"Mixed scrap excluding galvanized iron, busted sheet iron pipe or boilers would be worth $17.50 per ton delivered here. Ship heavy scrap copper sixteen cents per pound, mixed brass thirteen cents per pound." Going on in this letter they add; "Now relative to the machinery we of course cannot take your price on this, nor would we care to come out and look at it unless we had inventory from you stating exactly what you had to offer, its condition and very lowest price you will take for same. If you will furnish this information promptly we will get one of our men to come out on Saturday night to go over this property on Sunday, if you have no objection, and try to make a trade with you."

It appears that subsequently plaintiff shipped barrels of scrap in cars to defendant and the balance claimed by plaintiff was the sum now sued for.

The testimony of Mr. L. B. Showers, one of the liquidators, is positive that plaintiff and defendant had no contract

674

.in reference to these transactions. Mr. Showers testifies that he wrote and told the defendant that the company he represented had a lot of miscellaneous scrap for sale, asked for a price; that the price was given him and that he agreed to ship at the price named.

Witness was asked this question:

Q. In the answer of the defendant it is set forth that you separated from the scrap that you had contracted to sell to them, certain cast scrap and sold it to someone else. Did you contract to sell to Marx the scrap cast to which they refer?

A. I did'nt separate any cast or any other material from the scrap that I sold them.

Q. What kind of scrap did you contract to sell to Marx?

A. Just a lot of miscellaneous scrap, mostly pipe and a little cast.

Q. What other material did you have after the sale to Marx?

A. Nothing but a lot of machinery that I had not then decided to scrap.

Q. Did you agree to sell this machinery to Marx?
A. I asked them for an offer on it.

Q. Did they make you any offer?

 A. They told me they were not interested in it.

Q. Did you have anything available for sale besides the scrap which you actually delivered, and the machinery they told you they were not interested in?
A. No sir. We had some boilers and things like that we offered to sell to them and they told me they were not interested in them.

Q. I mean scrap iron cast?

A. We had some brass and copper pipe which I sold to them and shipped out to them.

Q. Was that part of the material sold as scrap or was that separate?

A. Well, it was all scrap.

Q. Was that paid for?

A. Not all of it, No sir.

675

Q. Does the scrap brass and copper represent part of this claim?
A. Well, they paid according to my recollection up to a certain day and at that time they sent their check they had not checked in the rest of the stuff and they were delaying the settlement for that.

The witness goes on to testify that he had two letters from Mr. Marx before he shipped any scrap and he called upon them personally; he never agreed to ship them any stuff, had inquiries from several dealers in this material and their prices were in line with all the others on this miscellaneous scrap. On the advice of his co-liquidator, Mr. Smith, he went over and had a talk with Mr. Marx speaking to him about this miscellaneous scrap and asked again for a price, and referring to his files, Mr. Marx made him the same price that he had made in his letter. He then asked Mr. Marx about the machinery, if he was interested in it and he said no; on account of the machinery having been through a fire he was not interested in it without first having seen it, and asked if I would make a price on a piece of machinery separately he would go and look at it and after he examined it would let me know whether he was interested in it or not; he also asked me whether I would be interested in some ice machinery that he was interested in, and I answered him no, all that we wanted was to get rid of what we had and I told him I would ship a car or two of miscellaneous scrap which I had, and would see further about the heavy machinery, which I could not be positive I could scrap; I wanted to sell it as heavy machinery if I could, he never did make a price of any kind on the heavy stuff; at the time of that meeting he asked me particularly whether there was any good pipe in this lot of miscellaneous scrap and after I had told him that the best of it would be pipes I told him I did not think there would be much good pipe, that it was mostly burned, warped and bent from the fire, and he remarked that that did not make any difference as long as it would stay in the car, and they would cut it up as long as there was no sheet iron or galvanized material or badly rusted light iron in it it was all right. Thats about all

676

there was to the conversation and I told him I would ship what there was and also the copper and brass, which was done. He testifies further that the price of the copper was sixteen cents a pound and thirteen cents for the brass, and that the bulk of the shipment made was copper and brass.

Q. Now how were you to know what was due for those valves?

A. They were examined, weighed and remitted for accordingly, and/~~therebill~~ I billed at/the blanket price, fifteen cents, simply to make a record of the/goods weight and the shipment.

Q. The Marx and Son were to demand what was due on those valves?

A. They were ~~weighed~~ simply to weigh the copper and brass separately and pay for it, sixteen cents for the copper, thirteen cents for the brass, I had no scales to weigh each separately.

Q. What are the items that you are charging defendants with not paying for?

A. As far as I am concerned there is a balance due on account, it is the amount in the rough, I don't know because they would never furnish me with the exact weight of the brass and copper separately, and there was an item of two of weight which they never furnished me with.

Q. You stated there was some six carloads of material that you decided to ship. When did you decide to scrap this material?

A. I tried at various times to get a better figure by selling it as useful machinery, but when I could not do that, as I only had the offer from John M. Murphy Company of thirty dollars a ton, I decided to sell it to them and ~~sk~~ did scrap and ship it to them. Nobody else ~~made~~ made me an offer on it.

Q. In exactly what condition was this material before it was scrapped?

A. With a very few exceptions it was very good machinery.

And he goes on to testify that he could not get any better offer as it stood and they only way that he could sell it was to scrap it, and he had offered it to the defendant before it was scrapped but/correspondence and verbally they re-

677

fused to buy it.

The Court then asked the witness the follo ing questions:

Q. Did those six c rs of c st come from th t scr pped m chinery exclusively?

A. Yes. The m chinery w s re lly not scr pped s lo ded up, but s it w s it w s sold on th b sis of thirty doll rs ton. I keep referring to it s scr p lthough the m chinery w s not broken up.

Q. As soon s you determined to sell it by weight it be-c me for the purpose of commerce, scr p nd sold by weight?

A. Yes.

Q. Is th t the m chinery th t is referred to in n of the letters shown to you nd th t you sked $450.00 for?

A. Yes.

Q. The m chinery w s in th t bunch?

A. Yes.

Witness further testifies th t the first c r went to John H. Murphy & Comp ny nd w s shipped M rch 22nd nd the first c r shipped to M rx w s M rch 27th.

H. S. Smith lso one of the liquid tors of the plain-tif comp ny testifies s follows:

Q. Did you h ve nything to do with the m king of the contr ct between M rx nd the Eunice Ice nd Power Comp ny?

A. There w s no contr ct m de th t I know of.

Q. Did you send to M rx and Sons all of the m teri l which you h d determined w s scr p on the d y the contr ct with M rx w s m de?

A. We h d; in fact we sent him more th n we h d int nded he w s to get.

Q. How long fter closing the de l with M rx w s it th t you closed the de l with Murphy?

A. We h d the de l with Mur hy before we h d the de l with

678

Marx. Murphy offered thirty dollars a ton for any machinery we had in case we decided to abandon the plant, decided not to use it again, and we could not find any other better offer.

Q. What did he designate in his offer of thirty dollars a ton?

A. Any cast machinery?

Q. His offer was then, thirty dollars a ton for castings, he did not want anything but castings?

A. Yes.

Q. At the time you received the letter from Marx and Sons dated February 14th did you have Murphy's offer of thirty dollars a ton for the cast under consideration?

A. We did.

Q. And you closed with Murphy after you closed with Marx?

A. We shipped to Murphy before we shipped to Marx.

The testimony of Isaac Marx Marx, after stating that he was a member of the defendant firm, had been engaged in business for twenty years, and giving his definition of mixed scrap as a general mixture of scrap out of the destroyed plant, was asked:

Q. In quoting $17.50 a ton F. O. B. New Orleans for mixed scrap upon what did you base your offer?

A. When we quote on mixed scrap coming from any sort of a plant, scrap from the debris, we know from our experience that we are supposed to get a certain amount of different grades of scrap, and the amount of cast usually figures 33 1/3 per cent and we could not pay $17.50 a ton delivered in New Orleans for a lot of skin stuff such as that shipped, twisted pipe, etc., because we have to recondition that scrap here and reship it to some other dealer and the freight rates are five or six dollars a ton, at that the scrap pipe itself was quoted twenty one dollars or twenty two dollars a ton delivered in the consuming market so that on the face of it, it showed that we expected to get a better grade of scrap than just pipe.

Q. What you might have expected to get would have no bearing

679

on the contract between you. What I want to know is simply
on what did you base your figure of $17.50 a ton?
A. On past experience.

Referring to the statements annexed to the defend-
ant's answer he says they were all correct and particularly
referring to the defendant's statement marked D 7 which is
an itemized account between plaintiff and defendant showing
that balance due plaintiff after deducting charges, to be
$343.79.

In testifying to the conversation had with one of
the liquidators, Mr. Smith, witness stated; "I asked what became
of the cast iron and he says: "Why you did not expect to get cast
iron for $17.50, we sold it for $33.00 a ton," either that or thir-
ty dollarsxxxxthirtyxdollars dollars, witness did not remember; and in
his testimony he further says in the same connection: "the cast iron
which they had gotten out of the debris should have come to us for
$17.50, because we could not pay that price for goods or stuff they
shipped to us.

On cross examination:

Q. You made the statement that your experience tells you that when
you buy scrap from a burned plant, you expect to get thirty three
and one-third per cent cast scrap?

A. Yes.

Q. You have heard the testimony and don't you know that, if you had
received the two cars that you claimed to have, you would have
gotten eighty per cent?

A. No, the testimony here is that they shipped the cast to Mur-
phy March 27th and 31st, and April,32nd, they shipped us the
last part, that only weighed thirty thousand pounds which is very
evident that they must have taken some of our cast iron to fill
out the car for Murphy.

Q. When you purchased a lot or two of mixed scrap from the Eunice
Ice & Power Company, you in reality purchased with the full knowl-
edge that you were purchasing exclusively of the machinery, is not
that true?

A. Exclusive of the machinery that is machinery not good to us, as I tell you our experience teaches us that when we buy mixed scrap in any character of plant such as this, a power or light plant, there is bound to be a lot of machinery that is broken in the fire that is cast scrap, past experience shows us that it will go 33 1/3 per cent cast scrap with mixed scrap.

Q. Did The Marx & Sons settled for the two cars shipped did they not?

A. Yes.

Q. Did you question the quality of the material shipped then?

A. I have a recollection we did, that we had that up verbally with Mr. Showers or with Mr. Smith, I don't remember correctly, we have a letter on file after we made the settlement, from which it is evident we must have questioned Mr. Showers.

Q. Didn't Mr. Showers tell you that there was/some usable machinery in the scrap which they sold to you?

A. They told us that they were selling us with the usual amount of cast iron in the scrap, whether machinery or otherwise.I din't care, I was buying scrap, no machinery.

Q. Did you take his word for that?

A. Yes, we didn't make an inspection of the plant.

On re-examination:

Q. Does the term mixed scrap include that pipe?

A. Yes.

Q. After you had agreed to buy mixed scrap from the Eunice Ice Company, did you make any offer on the pipe?

A. Yes, they offered to sell us a lot of salvaged pipe which they evidently collected out of the same debris.

Q. What did they ask for this pipe?

A. My recollection is about fifty dollars a ton, and we were entitled to it at $17.50 a ton, it came in our original purchase.

The next witness is J. E. Wiegand, and he testifies that he is the superintendent of the yard for A. Marx and Sons, that he had a record of these cars. He goes on to describe them,

681

give the numbers of the cars, together with the pounds of matter received.

Q. Was there any cast scrap contained in either of those cars?

A. Very little, if any; that is why I notified the office of the condition of the scrap, because I was expected to get what we usually get in a mixed carload of scrap and in the absence of this mixture, I reshipped the entire contents of those cars to another iron works in Indiana, where I think the stuff was finally rejected

The other portion of testimony of this witness relates to the different cars received by him for the defendants, their wieghts, and the character of goods as heretofore described by him.

It is evident to our minds that the defendants received from these liquidators, the character of goods purchased by them, they refused to accept and would not purchase the heavy machinery and so that was sold to other parties for a much greater price because it had greater value. The entire record, taking it as a whole, convinces us that there was no contract/in writing/and that
(either or orally)
the several shipments prior to the last one, handled by the defendans, were paid for ik by them, and after the last shipment had been received, they then stated that the shipments did not come up to their expectations, their testimony being based on past experiences; whilst on the other hand the testimony of the liquidtors in this case is maxani convincingly to the effect that the goods sent to defendants were undeniably the same to which there were no objections by the defendant at the time of the inspection, and as stated heretofore until final payment there was no objection at all made by defendants. However, defendants in our opinion justly claim the difference as shown by their exhibit D 7 between the amount claimed by plaintiff and the amount actually due by defendants to plaintiff, and from the facts testified to and the record, we are convinced that defendants' statement of the amount due is correct, or the sum of $343.79.

For the reasons assigned, it is ordered, adjudged and

682

decreed, that the judgment of the Court aquo in this case, which was for $444.76, be reduced to the sum of $343.79, and for this latter amount, xxkxx plaintiffs, the Eunice Ice, & Power Company, in liquidation, have judgment against defendants, A. Marx & Sons xx with legal interest thereon from judicial demand until paid, and that the reconventional demand of defendants, otherwise be dismissed, the costs of the appeal to be paid by plaintiffs, the Eunice Ice & Power Company in liquidation, and the costs of the lower Court be paid by the defendants, A. Marx & Sons, and se amended, judgment be affirmed.

-Judgment amended and affirmed-